## Carson's Sale.

It is not the duty of the plaintiff in an execution, at the sale of real estate by the sheriff, to make known to bidders, the amount of his debt, or whether the property is selling subject to, or clear of incumbrances; nor is it the duty of the sheriff to give any information at the sale on the subject of incumbrances; *caveat emptor* is the rule which is applicable to all such sales.

Inadequacy of price is not of itself sufficient ground, for setting aside a sheriff's sale.

IN the supreme court, motion to set aside the sale by the sheriff to Thomas Chambers, Esq., of the real estate of John Carson, Esq., deceased, made upon a *testatum levari facias*, issued out of the supreme court at Philadelphia, to the sheriff of Dauphin county, at the suit of Frederick Pigou, for the use of Thomas Chambers, administrator, *cum testamento annexo* of the Hon. Thomas Duncan, deceased, against the administrators of the late John Carson, Esq., deceased.

The exceptions to the confirmation of the sale, are noticed in detail, in the opinion of the court.

*M'Clure*, for exceptants, cited 1 *Story's Eq.* 588, 591, 461; 10 *Serg. & Rawle* 450; 3 *Rawle* 139; 2 *Watts* 53; 1 *Brown* 187; 4 *Yeates* 203; 13 *Serg. & Rawle* 167; 16 *Serg. & Rawle* 166; *Ibid* 309; 2 *Watts* 66.

*Rawn* and *Bayard*, for the purchaser, cited 2 *Rawle* 166; 2 *Penns. Rep.* 277; *Ibid* 382; 1 *Johns. Ch.* 502; 2 *Penns. Rep.* 135; *Dickey's Case*, 1 *Jour. of Juris.* 90; 2 *Penns. Rep.* 380; *Sug. Ven.* 241; 4 *Dall.* 221; 3 *Wash. C. C. Rep.* 537; 3 *Yeates* 405; 11 *Johns.* 556; 4 *Dess. Rep.* 687; 4 *Rawle* 448.

The opinion of the Court was delivered by

KENNEDY, J.—Under a *testatum* writ of *levari facias* sued out of the supreme court at Philadelphia, upon a judgment *sur* mortgage, at the suit of Frederick Pigou, for the use of Thomas Chambers, administrator, *cum testamento annexo* of the late Thomas Duncan, Esq., against the administrators of the late John Carson, Esq., deceased, directed to the sheriff of Dauphin county, within this district, commanding him to levy the amount of the money therein mentioned, by a sale of the land therein described; the sheriff, after having given due, and timely notice of the time and place of sale, returned the land sold by him to Mr Chambers, the plaintiff, for 6410 dollars, he being the highest and best bidder therefor. An application has been made by the defendants, the

administrators of Mr Carson and Ellis L. Updegrove, who claims a small part of the land sold, under a purchase made from Mr Carson in his lifetime, subsequently to the execution of the mortgage, to have the sheriff's sale set aside.

Five exceptions have been filed against it, which will now be considered and disposed of.

The first and third, being in part the same, will be considered together. The first is, that "the plaintiff in the execution, Thomas Chambers, who became the purchaser, having the control of the mortgage in favour of the Farmers and Mechanics' Bank, the first lien on the property sold, and to which it was supposed to be sold subject, did not communicate the fact that interest had been paid on that mortgage, until within about a year of the time of sale. The concealment of this fact, by the purchaser, was a fraud on the other bidders, and enabled him to get the property at a sacrifice." And the third exception alleges, "that it was the duty of the plaintiff, claiming the control of the mortgage in favour of the Farmers and Mechanics' Bank, to have made known its amount to the bidders on the day of sale, if the property was sold subject to it, and whether the property was selling subject to it or not."

In order, however, to determine whether these exceptions or any of the others filed, ought to have any effect upon the sale, it may be proper to state first, the circumstances attending the giving of the mortgage therein spoken of, to the Farmers and Mechanics' Bank. In the latter end of 1820, or beginning of 1821, some time after the death of John Carson, Esq., the mortgagor to Frederick Pigou, the personal estate of Mr Carson not being sufficient for the payment of his debts, his administrators were desirous of raising money, by giving a mortgage on the real estate of the deceased, to meet the payment of the claims of some of the creditors who were pressing it; and accordingly obtained an order of the orphans' court of Dauphin county in which the real estate lay, empowering them to do so. The real estate, which the administrators were thus authorized to mortgage, consisted of about three hundred and eighty-three acres of land, two hundred and twenty-eight acres of which, were included in the prior mortgage given to Frederick Pigou, upon which the judgment was had, and the sale complained of here, was made by the sheriff. The late Judge Duncan, being then the owner and assignee of the Pigou mortgage, for the purpose of accommodating the administrators and other children and heirs of Mr. Carson, who were all the children of his sister, and facilitating the procurement of the money, on the 30th of January 1821, agreed in writing under his hand and seal, that the mortgage and judgment of Frederick Pigou, against John Carson, late of Dauphin county, deceased, assigned to him by Thomas Stewartson, as attorney in fact of Pigou, should stand postponed to any mortgage that might be executed to the Farmers and

Mechanics' Bank of Philadelphia, by the administrators of John Carson, deceased, in pursuance of a decree of the orphans' court, and that such mortgage should have a preference to any lien he might have by virtue of the Pigou mortgage and judgment thereon.    The Farmers and Mechanics' Bank of Philadelphia, upon this preference being given, on the 1st of February 1821, advanced to the administrators of John Carson, 6360 dollars, taking from them, at the same time, their bond and a mortgage upon the real estate of their intestate, consisting of the three hundred and eighty-three acres before mentioned, to secure the repayment of the money, with interest thereon. The mortgage thus given to the Farmers and Mechanics' Bank of Philadelphia, afterwards became the property of Mr Arthur Harper, of Philadelphia, to whom it was assigned by the bank.    He held it till his death, when it came into the hands of his executors. Shortly before the sale in question, Mr Chambers, the plaintiff, made an arrangement with Mr Charles Waters, of Philadelphia, one of the executors of Mr. Harper, by which Mr Chambers was to have the control and direction of the bank mortgage; and a few days thereafter, he procured the amount of the mortgage, with the interest due thereon, to be paid to Mr Waters, in consideration whereof, the latter assigned it to the Hon. George Chambers, brother of the plaintiff.

Now it is complained of in the first exception, that Mr Chambers, the plaintiff, knowing the amount that was due upon the mortgage given to the bank, was bound to have made it known to the bidders at the time and before the property was sold; and because he did not do so, it is imputed to him as a fraud committed on the other bidders, that enabled him to get the property at a sacrifice, and, therefore, vitiates the sale.    And again, by the third exception, that it was not only his duty to have made known to the bidders the amount due on the bank mortgage, but likewise, to have advised them whether the property was then about to be sold subject to it or not, and how it was to be sold in that respect.

It is difficult to conceive how a party having become a purchaser of property at auction, can be said to have practised a fraud upon other bidders attending the sale, by his having either done or omitted to do, that which had a tendency to prevent them from bidding as much for it as otherwise they might or would have done.    That the owner of the property or other persons interested in its bringing a price equal to its value, might very well be considered as defrauded by such conduct, can be readily comprehended; because they are thereby injured in having their vested rights reduced and diminished.    But that other bidders, as such merely, who have no right or interest of any kind whatever, in the property can be injured or affected in their rights by it, is quite a novel idea, if not altogether incomprehensible.    That a fraud may be committed on bidders at an auction, is doubtless practicable, but I believe it has never been supposed that it could be effected by

- [Carson's Sale.]

doing that, which, in its nature was calculated to depreciate the value of the property, being sold, and consequently tend to prevent a fair price from being obtained by it. It would rather seem to be, that it can only be perpetrated by doing something of a directly opposite tendency; as for instance, by recommending the property, for and on account of some valuable qualities that may not be of a nature discoverable by the eye, upon mere inspection, with a view to induce bidders to give more for it than otherwise they would do; or by bidding, as has been held in some cases, without any intention or wish to buy, but merely for the purpose of inducing others to bid more than the real value of the property or more than otherwise it would have been sold for; a practice that has been condemned and denominated *puffing.*

But can the forbearance of Mr Chambers to mention, at the time of sale, the amount then due on the bank mortgage, be considered a fraud upon any one interested or concerned in the matter? What right have the administrators of Mr Carson to make this objection? The bond and mortgage were given by them, they were personally bound for the payment thereof; and who had a better right to know what was paid and how much still remained unpaid than they? They must be presumed to have known the precise amount due with more certainty than Mr Chambers can be supposed to have known it. One of them was present attending the sale, and yet he now sets up this objection to it. It would not seem to come with much grace from him seeing it was in his power to have told himself, how the matter stood, had he deemed it material to the interest of himself or the other heirs, better than either Mr Chambers or his attorney could. It is, therefore, perfectly idle, if not worse, to talk of Mr Chambers' being bound to proclaim at the time of sale the amount actually due on the mortgage; and that because he did not do so, to charge him with a fraud on account of it.

The second exception, however, is of a still more extraordinary character, if possible, than the two already noticed. By it, it is alleged, " that it was the duty of the sheriff to have made known the fact, whether he was not selling the property, subject to the mortgage in favour of the Farmers and Mechanics' Bank, for 6360 dollars, and interest, which was not done." I think it likely, that it never was before heard of, that it was the duty of the sheriff to examine into and to know before he sold real estate taken in execution by him, whether there were any incumbrances upon it or not, besides the one for which the sale was about to be made; and then not only to make them known at the time of sale, but to decide and give notice to those in attendance, who may be disposed to bid, what will be the legal effect of his sale; whether it will discharge the property from all or any of the other incumbrances in case such exist; or whether it will still remain liable to them, and if to any and not all, which of them. If such were his duty

it would require him to decide questions occasionally, which few, if any of our sheriffs would be competent to pass upon. But at no time, either before or after the sale, can he be called on to decide on any such matters; for after the sale, when he has received the money, he may bring it into court and demand of the court an order or decree, directing how it shall be paid and distributed among those, who, in the opinion of the court, are by law entitled to it; and thus protect himself from all responsibility in respect to the disposition made of it. Bidders, therefore, must look out and take care of themselves. It is their business to examine beforehand; and after having made themselves acquainted with the facts and circumstances in relation to incumbrances, if any exist, then to decide for themselves as to what will be the legal effect and operation of the sale upon them. It is true that in doing this, questions may arise occasionally of no little difficulty; such indeed as may require the best legal advice that is to be had, in order to bid safely; but this, generally, is not without the reach of those who are able to buy; and *caveat emptor*, as was said by the attorney of the plaintiff at the time of the sale, when he was asked to say, " whether it was to be understood, the property was to be sold, subject to the bank mortgage or not," is certainly the rule that must govern and determine the rights and liabilities of those who become purchasers at sheriff's sales. The sheriff, in making the sale, acts merely as a ministerial officer. His duty is limited and prescribed by law. Before the sale he is required to give previous notice thereof, in the manner prescribed by the act of assembly, describing the property correctly, and appointing the time and place of sale. Having done this, he is next, at the time and place of sale, to sell it by auction, to the highest and best bidder. And this may be considered the sum of his duty until he comes to execute and acknowledge his deed, conveying the property to the purchaser. But certainly neither the sheriff nor the plaintiff in the execution has any authority to cause the property to be sold differently from what the law prescribes; nor yet to declare what shall be the legal effect and operation of the sale, when made in due conformity to the law, so as to affect the rights of others in a manner different from the legal effect; nor is the plaintiff bound to make any declaration or statement of his intention, that might compromit his own, so as to deprive himself of what the law has secured to him.

The fourth exception is, " that if the property was not sold, subject to the payment, by the purchaser, of the mortgage in favour of the Farmers and Mechanics' Bank in addition to the sum bidden, there was a mistake and misapprehension among the bidders, of the amount they would be liable to pay for the property, which deterred them from bidding a sufficient price for it." In answer to this, it is sufficient to say that if any misapprehension, such as is here mentioned, existed on the part of any persons dis-

[Carson's Sale.]

posed to buy the property, it is very clear that it does not appear to have been caused or produced by any thing that was either said or done by the plaintiff, who is the purchaser, nor yet by the sheriff who made the sale. This being the case, it cannot be pretended that such misapprehension would be any reason, whatever, for setting the sale aside. But it is said that Mr Grimshaw interfered at the sale, and proclaimed that his sister-in-law had a mortgage, meaning the bank mortgage, as it would seem, for 6000 dollars, on the property; and that during the progress of the sale, he announced, repeatedly, in the hearing of the bidders, as he thinks, that the proportion of the said mortgage, which would be a lien on the property then selling, would be about 4000 dollars; and that they should add that to the bid. This is Mr Grimshaw's own statement of the matter; and as an apology for doing so, he says, he was under the impression that his children, in consequence of their relationship with Mr Harper, the assignee of the bank mortgage, might have a contingent resulting interest in the amount of it. Though it may seem strange that he should have thought his interference necessary, after having received a letter, but two or three days before, from Mr Waters, the executor of Mr Harper, advising him, that he, Mr Waters, "had made such arrangement, as to the Carson mortgage, as to render it unnecessary to interfere at all with the proceedings of sale in the suit of Mr Chambers, the representative of Judge Duncan; and that in accordance with that arrangement, Mr Chambers was fully charged with his (Mr Waters) instructions, and had his authority to act on his behalf, as executor to Mr Harper's will, as he should think proper in the case." But Mr Grimshaw also says, " that immediately previous to any bid being given, as he thinks, and after a great many notices of a cautionary nature had been read by the sheriff or crier, he asked Mr Rawn, who, he understood, was attending the sale as the attorney of Mr Chambers, in a loud and distinct tone of voice sufficient to be heard by all the bystanders, whether it was to be understood the property was to be sold, subject to the mortgage of 6000 dollars, of his sister-in-law or not." To which Mr Rawn replied, " *caveat emptor*," in a voice also sufficiently loud to be heard by all the bystanders. Now this goes to repel most effectually the inference, that has been attempted to be drawn by the counsel of the administrators of Mr Carson, that because Mr Rawn, the attorney of Mr Chambers, the plaintiff, did not follow Mr Grimshaw around, upon the auction ground, and contradict every thing which he was pleased to say upon the occasion, that he must, therefore, be considered as having assented to and affirmed all that he did say. Mr Rawn's reply to Mr Grimshaw proves most clearly, that he intended the law should determine the effect of the sale, and resolve the question put by Mr Grimshaw; and that every one present who felt disposed to buy, must protect and take care of himself, by consulting the law; and regulate his bid-

IV.—T

ding for the property accordingly. For he, Mr Rawn, was not willing to risk a direct answer, lest he might err, and thereby injure the interests of his client. Certainly no one had the slightest reason to complain of this; and it appears to have been the only safe course, perhaps, that could have been adopted and pursued in order to effect a sale that should be free from any valid exception. And as to the effect, which the sale made here, will have in law on the bank mortgage or on the mortgage under which the sale has taken place, it is unnecessary for us to determine now. Indeed it has not been argued, nor does it necessarily arise and we therefore intimate no opinion in regard to it. If the party claiming to recover the amount of these mortgages wishes to obtain legal advice he must be left to seek it elsewhere.

Whether the property has been sold for as much money as might be had for it, on a resale to be made by the sheriff, it is impossible to say: for it does not appear from the depositions of the witnesses, that any higher price would have been given by any in attendance upon the sale, under any disclosure of facts and circumstances, that could have been made, or knowledge that could have been possessed in respect to them, on the subject. No one certainly has testified that he would, in such case, have given more. Nor has any one testified, that he would give a higher price on a resale. The counsel for the applicants, to be sure, has asserted that a much higher price would be obtained. Counsel, however, not infrequently enter into all the feelings of their clients, and thus permit their wishes, sometimes to deceive their judgments; and think it cannot fail of being so, because they wish it. We know from some experience, that second sales of the same property, for the same cause, have perhaps, more frequently brought less, than more money, excepting in cases where the first have been set aside for, and on account of fraud. But in the present case, there is not the slightest pretence for making the imputation of fraud; and it was rash, to say the least of it, to indulge in it here. We feel ourselves bound in justice to the plaintiff, who is the purchaser in this case, as well as to the sheriff, to say that the sale on their parts, appears to have been conducted and made with all perfect fairness.

This being the case, then, even if the price obtained for the property were inadequate, it would not be a sufficient ground for setting the sale aside. If a sheriff's sale be fairly made, though the price may be inadequate, it is our duty notwithstanding, if the purchaser, who has thereby acquired a vested interest, require it, to enforce the perfecting of the title by compelling the sheriff to execute and acknowledge the deed of conveyance. In the Les. of Murphy *v.* M'Creary, 3 *Yeates* 405, 6, where the lessor of the plaintiff claimed through a sheriff's sale made under an execution against the former owner of the land, and on the trial it being objected against the sale, that the land was struck off at a great

under-value, not one-sixth of what it should have produced, it was held by the court to be no ground of relief, if the sale was fairly conducted, and due notice was given. See Weitzell *v.* Fry, 4 *Dall.* 221; Dickey's Case, *Com. Pleas, April* 1820; 1 *Whart. Dig. tit. Execution, pl.* 118; *S. C. reported* 1 *Jour. Juris.* 92; Harmon *v.* Reese, 1 *Browne's Rep.* 11; Cooper *v.* Galbraith, 3 *Wash. C. C. Rep.* 546; Simon *v.* Simon, 1 *Miles.* 404; Young's Appeal, 2 *Penns. Rep.* 360.     And in Vastine *v.* Fury et al. 2 *Serg. & Rawle* 426, where the sheriff had made a sale of the land to B, under a *levari*, at the suit of A, but at the instance of A's attorney, returned it "unsold for want of buyers; B, having made default in payment;" when an *alias levari* was sued out to a subsequent term, under which, the land was sold to A, without any notice having been given to B to pay the money, though ready to do so, the court ordered the second sale to A to be set aside, and directed the sheriff to amend his return on the first *levari* in favour of B, and to make a deed accordingly to B.     In Coles *v.* Trecothick, 9 *Ves.* 234, Lord Eldon lays it down, that unless the *inadequacy* of price, is such as shocks the conscience and amounts in itself to conclusive and decisive evidence of fraud in the transaction, it is not a sufficient ground for *refusing a specific performance.*    Now, although this, as a rule, may be thought to impinge upon the distinction, which seems long since to have been recognized, and to have obtained in courts of equity, between decreeing a recision of a contract, and a specific performance thereof, yet the principle has ever been admitted as strictly applicable to the *rescinding* of contracts, which is perfectly analogous to the case of setting aside sheriff's sales of land; for where the application is made to the court for that purpose, the action required of the court, is in effect to rescind the contract for the purchase, by setting the sale aside.     And it is clear, if the sale be once set aside on the ground of fraud, that no suit can be sustained afterwards for the recovery of damages upon the contract by either party, as it may be after the mere refusal of a court of chancery to decree a specific performance of a contract of sale, made voluntarily by the owner of land.     It is laid down by Mr Justice Yates, in Livingston *v.* Byrne, 11 *Johns.* 566, that "a sale made at auction, and under process of law, ought not to be invalidated for mere *inadequacy of price*, without additional circumstances to justify it.     This principle, he says, is stated by Lord Eldon, on the rehearing of the case of White *v.* Damon, 7 *Ves.* 34, and the case of Burrows *v.* Locke, 10 *Ves.* 474." To which he very justly adds, "it is necessary to secure the proper confidence on the part of purchasers at sales of this description, and to render titles, if fairly obtained, certain, and not liable to be impeached by the various opinions as to its value."

The fifth exception has been abandoned, in consequence of an agreement in writing filed by the purchaser in favour of the persons therein named.

The application to set the sale aside, is therefore refused, or the

rule, if one has been entered to show cause why it should not be done, is discharged; and the sheriff is permitted to acknowledge his deed to the purchaser.